## Maloney, Appellant, *v*. Madrid Motor Corporation.

Argued April 27, 1956. Before STERN, C. J., JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*John V. Lovitt*, with him *George E. Beechwood* and *Beechwood & Lovitt*, for appellant.

*Owen B. Rhoads*, with him *Arthur E. Newbold, III*, for appellee.

OPINION BY MR. JUSTICE CHIDSEY, May 21, 1956:

This action in assumpsit was instituted by the plaintiff-appellant to recover a sum which he alleged defendant agreed, but failed to pay him as commissions under a contract of employment. The case was tried before a jury which was unable to agree on a verdict and was therefore discharged. The court granted defendant's motion for judgment upon the whole record and entered judgment accordingly under the provi-

sions of the Act of April 20, 1911, P. L. 70, 12 PS §684. Plaintiff appeals therefrom. In reviewing the record we are required to consider the facts and reasonable inferences therefrom in a light most favorable to the plaintiff: *Staller et al. v. Philadelphia Rapid Transit Company*, 339 Pa. 100, 14 A. 2d 289; *Shapiro v. Philadelphia Electric Company*, 342 Pa. 416, 21 A. 2d 26; *Harris v. DeFelice*, 379 Pa. 469, 109 A. 2d 174.

Defendant, Madrid Motors Corporation, is engaged in the business of renting motor vehicles. On September 15, 1944, plaintiff and defendant entered into a written contract whereby plaintiff was employed by defendant as manager of its Milestone Division at an annual salary of $10,400 and, as additional compensation, a 2% commission on the gross revenue from the rentals. The contract provided that it was to run for five years, and thereafter would be automatically renewed for one year periods until either party gave ninety days' written notice of intention to terminate. In June of 1949, four months before the expiration of the initial five year term, defendant through its president, delivered to plaintiff the following letter: ". . . In accordance with the agreement which we made several years ago, we do not wish to continue this agreement, in the future, when it expires next September. As you probably know, we have done considerably better under our arrangements with you than we agreed to in the agreement and, of course, would like the privilege of doing that again. However, I do think that we should try to arrive at your compensation a little differently than provided for in this agreement, and I think you will agree with us in that respect. This is merely a notice as called for under the agreement, but we do not wish to renew it . . .".

Subsequent to the expiration of the contract in September of 1949, until plaintiff left defendant's employ

in January, 1952, plaintiff continued to receive salary checks as under the contract. He also received monthly commission checks through January, 1950, after which he received no additional compensation until December, 1950, when he received a check for $5,000. This check had noted on its voucher "Additional Earnings for year of 1950". The testimony regarding this check shows that both plaintiff and defendant considered it to be a general bonus check, not a check for commissions owing plaintiff. There was no testimony equating this $5,000 with commissions at 2% on the gross rentals during 1950.

Testimony was presented by both sides showing that the parties did not agree on the method of computing additional compensation for plaintiff. The following portions of plaintiff's testimony are pertinent in this respect: "Q. After you opened that letter and read it, what did you do? A. Well, I thought it over for a while, and within about two to three weeks I had a conference with Mr. Thornton [defendant's president], and he said: 'There is nothing to it; it is just a wording under the agreement. We will continue on just the same.' . . . Q. Did you have any subsequent conversations with respect to compensation? A. We had no subsequent discussions about compensation, because the matter went on just the same until February came along and I didn't get a check in February. Q. February of what year, Mr. Maloney? A. 1950. I mentioned to the bookkeeper, I said: 'Carl, where is my check?' He told me that Mr. Thornton told him to discontinue giving me the check, that he was going to make other arrangements with me and pay me on a different basis. Q. Did you discuss that with Mr. Thornton? A. I discussed that with Mr. Thornton. The other basis we discussed, I would say, every two or three weeks during the ensuing year and a half to two years, and at

each time Mr. Thornton would make the remark: 'We'll get down to it pretty soon, Charlie; I've got all the papers on my desk. We're going to arrive at a different method of compensation.' That is as far as I could ever get with reference to what different method of compensation there was to be. That went on and on and on.".

On cross-examination plaintiff testified: "Q. After January, 1950, you and Mr. Thornton had a number of discussions in an attempt to work out what your compensation would be and on what basis; didn't you? A. No, we never discussed the matter. We would come up to a certain point. Then the discussion would end. There was never any settlement arrived at, not even a discussion of settlement—'We will get around to it. I have the figures here. As soon as I can get to them, we'll do something about it.' That time never came. Q. It was never settled? A. It was never settled. . . . Q. It was never settled prior to the termination of your employment in January, 1952? A. No, sir. Q. It was left up in the air? A. Left up in the air.".

The sole question presented by this appeal is whether from this evidence, taking all facts and reasonable inferences therefrom in a light most favorable to the plaintiff, plaintiff is entitled to commissions as specified in the contract, either because the alleged notice of termination was ambiguous and hence of no effect or because the subsequent conduct of the parties nullified the notice of termination.

There can be no question but that the letter constituted an effective notice of intent to terminate the contract. The general rule is that notice for the termination of a contract must be clear and unambiguous, and where the conduct of one having the right to terminate is ambiguous, he will be deemed not to have terminated the contract: *Wright v. Bristol Patent*

*Leather Company,* 257 Pa. 552, 101 A. 844; *Berwick Hotel Co. v. Vaughn,* 300 Pa. 389, 150 A. 613; *Holmes Electric Protective Company of Philadelphia v. Goldstein,* 147 Pa. Superior Ct. 506, 24 A. 2d 161. Here the letter gives clear notice of intent to terminate when it states: ". . . we do not wish to continue this agreement, in the future, when it expires next September.".

There is no evidence from which a nullification or a retraction of the notice could be inferred. Following termination, the parties agreed to continue "under the same basis". This was done for a period of four months after which plaintiff was informed: "We're going to arrive at a different method of compensation.". Since the offer to continue "under the same basis" did not specify a definite time or prescribe conditions which would determine the duration of the relation, the contract is presumed to be terminable by either party at will: *Jones v. Pittsburgh Mercantile Co.,* 295 Pa. 219, 145 A. 80; *Slonaker v. P. G. Publishing Company,* 338 Pa. 292, 13 A. 2d 48; *Cummings v. Kelling Nut Company,* 368 Pa. 448, 84 A. 2d 323. To overcome this presumption of termination at will, the burden was on plaintiff to show facts and circumstances establishing an agreement as to tenure of employment at the additional compensation specified in the original contract: *Cummings v. Kelling Nut Company,* supra. The evidence, particularly plaintiff's testimony, clearly shows that no such agreement was achieved.

Since plaintiff was unable to prove that following September, 1949, he was entitled to 2% commissions as under the original contract, it was proper for the lower court to grant judgment for defendant on the whole record.

Judgment affirmed.